UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

**CURTIS GONZALEZ**,

Plaintiff,

v.

**MERRICK GARLAND**,

Defendant.

Civil Action No. 21-1653 (TSC)

---

## MEMORANDUM OPINION

Plaintiff Curtis Gonzalez is a Mexican-American man who began working for the Federal Bureau of Investigations ("FBI") in February 2013 and was indefinitely suspended in August 2020.  Compl. ¶¶ 2, 6, ECF No. 1.  He alleges he was discriminated and retaliated against by the FBI in violation of Title VII of the 1964 Civil Rights Act.  *Id.* ¶ 2.  Defendant U.S. Attorney General moves to dismiss this suit or, in the alternative, for summary judgment, arguing that Plaintiff fails to state a claim upon which relief can be granted.  *See* Def.'s Mot., ECF No 8 at 1-2.  For the following reasons, the court will GRANT Defendant's Motion to Dismiss.

## I.    BACKGROUND

The court assumes the truth of the facts alleged for purposes of this motion.  Beginning in 2013, Plaintiff served as a special agent ("SA") in the FBI's Chicago Field Office, where he worked in the Counterterrorism Squad CT6.  Compl. ¶¶ 5-9.  In 2015, the FBI assigned SAs Ryan Wherfel and Michael Wujciga, both of whom are White men, to CT6.  *Id.* ¶ 9.  Around March or April 2016, CT6 SAs began reporting to Supervisory Special Agent ("SSA") Benjamin Beno.  *Id.* ¶¶ 9-10.  Assistant Special Agent in Charge ("ASAC") Christopher Serdinak served as CT6's second-level supervisor.  *See Id.* ¶ 29.

Plaintiff claims that between 2016 and 2019, his coworkers and supervisors engaged in a variety of discriminatory conduct. On November 16, 2016, Wujciga hung a Nazi flag in Wherfel's open office cubicle. *Id.* ¶¶ 12-18. After taking down the flag, Plaintiff reported the incident to Beno, who "laughed in response" but said he would look into it. *Id.* ¶¶ 14-16. During the same conversation, Plaintiff also reported Wherfel for making sexist and racist comments toward Intelligence Analyst Tomoyo Nishimori, an Asian American woman. *Id.* ¶¶ 17, 24, 26. Plaintiff claims that Beno knew that Wherfel "continued to frequently and openly target colleagues who were women and/or Asian American" through at least November 2018, and that Beno failed to fulfill his duty to report Wherfel's conduct to the FBI's Inspection Division (INSD). *Id.* ¶¶ 23-29.

On September 26, 2017, Plaintiff learned that SA Jennifer Drager, a White woman, had accused him of misconduct, and he contemporaneously informed Beno and Serdinak that Drager had discriminated against and harassed him. *Id.* ¶¶ 29-30. The FBI Office of General Counsel treated the employees' cross-complaints as a single non-delegated investigation, meaning only the INSD, and not the Chicago Field Office, would conduct the investigation. *Id.* ¶¶ 31-32. Plaintiff claims that Beno and Serdinak interrogated him about Drager's allegations "in contravention of the requirements for a non-delegated investigation." *Id.* ¶¶ 33-35. He alleges that Drager openly discussed the INSD investigation and Beno left paperwork concerning the investigation in his office where it could be seen. *Id.* ¶¶ 42-46. This prompted Plaintiff to report Beno to supervisors and those overseeing the INSD investigation, including INSD Acting Director Nancy McNamara, who later became the Office of Professional Responsibility ("OPR") Acting Assistant Director. *Id.* ¶ 69.

On October 26, 2017, Beno rated Plaintiff's FY2017 Annual Performance as "Excellent," instead of "Outstanding," although he had earlier told Plaintiff that he was on track to receive an "Outstanding" rating. *Id.* ¶¶ 141-44. About a month earlier, Beno had recommended Plaintiff for an award and recognized him for "continuing to go above and beyond his job duties." *Id.* ¶ 146.

SSAs Matthew Scott and Sean Wells, White male supervisors within INSD's Internal Investigations Section, interviewed Plaintiff around February 7, 2018, and Plaintiff told them about several instances when Wherfel and Wujciga displayed racist and sexist behavior, but Beno failed to take action. *Id.* ¶¶ 47-48. Plaintiff later informed Scott and Wells that SAs Drager, Wherfel, and Simin Langer were discussing his case without authorization, but Wells dismissed his concerns. *Id.* ¶ 56.

On April 29, 2018, Plaintiff was transferred to the human intelligence ("HUMINT") squad. *Id.* ¶ 57. On July 2, 2018 SA Janine Wheeler, Chicago Field Office's Media Officer, asked Plaintiff if he would be interested in serving in the newly created position of Latino Media Representative and asked Plaintiff to attend the Public Affairs Officer Training. *Id.* ¶¶ 59, 61. Plaintiff claims the Chicago Field Office's Undercover Coordinator also asked if he would be interested in becoming a certified Undercover Employee, but Deputy Special Agent in Charge Todd Carroll refused to consider him for the Latino Media Representative position, prohibited him from attending the Public Affairs Officer Training, and rejected his request to become an Undercover Employee because he had a pending INSD investigation. *Id.* ¶¶ 62-65. Plaintiff claims that Carroll's actions violated the Chicago Field Office's policy "to treat everyone involved in the situation equally and impartially until the OPR investigation concluded." *Id.* ¶ 66.

On October 10, 2018, OPR issued a proposed 60-day suspension against Plaintiff based on the INSD investigation, although Plaintiff claims the standard penalty for such misconduct is 30 days. *Id.* ¶¶ 70-71. OPR then provided the allegations to FBI's Security Division in the event they were relevant to Plaintiff's Top Secret security clearance. *Id.* ¶ 73. Plaintiff claims that news regarding the INSD investigation and his proposed suspension spread throughout the Chicago Field Office. *Id.* ¶¶ 79-81.

On January 24, 2019, Plaintiff responded to the proposed suspension, denying "the bulk of the allegations against him." *Id.* ¶ 83. On February 12, 2019, OPR issued a final decision suspending Plaintiff for 60 days. *Id.* ¶¶ 86, 92. Plaintiff appealed the suspension, which was sustained on September 27, 2019. *Id.* ¶ 118.

On May 6, 2019 and January 2, 2020, Plaintiff submitted "Common Household" transfer requests to move offices with his wife, who was also an FBI agent. *Id.* ¶¶ 103, 120. The FBI's Human Resource Division denied his requests on May 30, 2019 and March 16, 2020. *Id.* ¶¶ 109, 124.

On August 3, 2020, the FBI revoked Plaintiff's Top Secret security clearance, allegedly due to the OPR's findings. *Id.* ¶ 132. As a result, the FBI indefinitely suspended Plaintiff on August 6, 2020. *Id.* ¶ 133.

On June 5, 2019, Plaintiff contacted an EEO counselor and on July 8, 2019, he filed a formal complaint of employment discrimination, alleging that the FBI discriminated against him on the bases of sex, national origin, and reprisal. *Id.* ¶ 155; First EEO Complaint, ECF No. 8-6. A final agency decision was not issued for this complaint before Plaintiff filed this case. Def.'s Statement of Undisputed Facts ¶ 41, ECF No. 8-1. On September 17, 2020, Plaintiff contacted an EEO counselor again, and on October 23, 2020, he filed a second formal complaint of

employment discrimination, claiming that the FBI discriminated against him on the bases of race, sex, national origin, non-sexual harassment, and reprisal.  Compl. ¶¶ 132, 156, 169; Second EEO Complaint, ECF No. 8-8.  The FBI EEO office dismissed Plaintiff's second complaint on March 22, 2021.  Compl. ¶ 156.

## II.        LEGAL STANDARD

### A.  Rule 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible when it permits the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678 (citation omitted).  When considering such motion, the court must construe the complaint in the light most favorable to the plaintiff.  *See Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979), *aff'd on reh'g*, 628 F.2d 199 (D.C. Cir. 1980) (internal quotations omitted) ("[t]he complaint must be liberally construed in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged").  In employment discrimination cases, although plaintiffs must establish a plausible claim for relief, they do not need to "plead every fact necessary to establish a prima facie case to survive a motion to dismiss."  *Jones v. Air Line Pilots Ass'n, Int'l*, 642 F.3d 1100, 1104 (D.C. Cir. 2011) (citation omitted).

### B.  Rule 56

Summary judgment is appropriate when there is no disputed genuine issue of material fact, and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  A dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In considering such motion, the court must view all facts in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits. . .which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp.*, 477 U.S. at 323 (internal quotations omitted).  The nonmoving party, in response, must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (internal quotations omitted).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Liberty Lobby*, 477 U.S. at 249–50 (citations omitted).

### III.   ANALYSIS

#### A. Exhaustion

"Title VII complainants must timely exhaust their administrative remedies before bringing their claims to court."  *Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010) (internal quotation marks and citation omitted).  The exhaustion process requires two steps.  First, within 45 days of the alleged discriminatory act, a complainant must contact an EEO Counselor.  29 C.F.R. § 1614.105(a)(1).  Second, if the matter is not resolved informally, the employee must file a formal complaint of discrimination with the agency.  *Id.* §§ 1614.105(d), 1614.106(a).  The employee may amend the complaint "at any time prior to the conclusion of the investigation to include issues or claims like or related to those raised in the complaint."  *Id.* § 1614.106(d).

"For purposes of exhaustion, there are two types of Title VII claims: (1) claims of discrete retaliatory or discriminatory acts and (2) hostile work environment claims."  *Laughlin v.*

*Holder*, 923 F. Supp. 2d 204, 209 (D.D.C. 2013) (citing *Nat'l R.R. Passenger Corp. v. Morgan*,

536 U.S. 101, 110, 115 (2002)).  An employee must timely exhaust the administrative process

for each discrete act for which he seeks to bring a claim, which means that discrete

discriminatory acts "are not actionable if time barred, even when they are related to acts alleged

in timely filed charges." *Burkes v. Holder*, 953 F. Supp. 2d 167, 173 (D.D.C. 2013) (citing

*Morgan*, 536 U.S. at 113).  "Each discrete discriminatory act starts a new clock for filing charges

alleging that act.  The charge, therefore, must be filed within the 45-day time period after the

discrete discriminatory act occurs." *Morgan*, 536 U.S. at 113.  Hostile work environment claims

are "different in kind from discrete act claims" because "[t]heir very nature involves repeated

conduct." *Id.* at 115.  "Provided that an act contributing to the claim occurs within the filing

period, the entire time period of the hostile environment may be considered by a court for the

purposes of determining liability." *Id.* at 117.  That act need not be the last act; subsequent

events "may still be part of the one hostile work environment claim." *Id.*

   Plaintiff's Complaint did not provide the date he contacted an EEO Counselor, but the

information is included in Plaintiff's EEO Complaints, which Defendant attached to its Motion.

Ordinarily, if the court relies on materials other than facts alleged in the complaint, documents

attached as exhibits or incorporated by reference, documents upon which the plaintiff's

complaint necessarily relies, and facts of which the court may take judicial notice, the motion is

converted to one for summary judgment. *Vasser v. McDonald*, 228 F. Supp. 3d 1, 9 (D.D.C.

2016).  When considering exhaustion, courts have found that relying on administrative orders

and complaints does not convert the motion into one for summary judgment if the documents

"referred to in the complaint, ... are integral to [the plaintiff's] exhaustion of administrative

remedies, and are public records subject to judicial notice." *Laughlin*, 923 F. Supp. 2d at 209;

*see Vasser*, 228 F. Supp. 3d at 8; *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004); *Bowe–Connor v. Shinseki*, 845 F.Supp.2d 77, 89 n. 6 (D.D.C. 2012).  Accordingly, the court will take judicial notice of Plaintiff's EEO Complaints without converting Defendant's Motion to one for summary judgment.

1.  Security Clearance Revocation and Indefinite Suspension Claims

Defendant does not dispute that Plaintiff's security clearance and indefinite suspension claims are timely filed.  The FBI revoked Plaintiff's security clearance on August 3, 2020 and indefinitely suspended Plaintiff on August 6, 2020.  Compl. ¶¶ 132-33.  Plaintiff contacted his EEO counselor regarding the revocation of his security clearance and indefinite suspension on September 17, 2020, within the required 45-day period.  Accordingly, Plaintiff's security clearance revocation and indefinite suspension claims were properly exhausted.

2.  Transfer Request Claims

The FBI's Human Resource Division denied Plaintiff's first spousal transfer request on May 30, 2019.  *Id.* ¶ 109.  Plaintiff first contacted his EEO counselor on June 5, 2019 and included this claim in his First EEO Complaint.  *Id.* ¶ 155.  Consequently, his May 2019 transfer request claim was timely filed and properly exhausted.

The FBI denied Plaintiff's second spousal transfer request on March 16, 2020, *id.* ¶ 124, approximately six months before he contacted his EEO Counselor regarding his Second EEO Complaint on September 17, 2020.  *See* Second EEO Complaint.  Accordingly, the court will dismiss Counts 1 (disparate treatment based on race, national origin, and sex) and 3 (disparate treatment based on retaliation) regarding Plaintiff's second transfer request claim as untimely because he did not contact the EEO office within the required 45 days.

3.      Hostile Work Environment Claims

Plaintiff originally alleged that several discrete acts occurred before April 2019, but he did not contact his EEO counselor until June 5, 2019, outside of the 45-day window. *Id.* ¶ 155. Those acts include Beno's decision to rate Plaintiff "Excellent" rather than "Outstanding" on October 26, 2017, Carroll's decision not to appoint Plaintiff as the Latino media representative on July 2, 2018, and OPR's decision to suspend Plaintiff for 60 days on February 12, 2019. Compl. ¶¶ 141, 59-62, 86.

In his opposition, Plaintiff conceded that his complaints about these discrete acts were untimely filed.  He argues however, that "the three untimely discrete acts. . . together with the additional acts of harassment Plaintiff identified in his Complaint [namely the denial of his transfer requests], constitute one unlawful employment action, actionable under Title VII" as hostile work environment claims.  Pl.'s Opp'n. at 13.  He asserts the same hostile work environment claims based on race and retaliation in Counts 2 and 4 respectively.  *See* Compl. ¶¶ 164, 172-73.

As previously noted, a hostile work environment claim may be timely as long as "an act contributing to the claim occur[ed] within the filing period," even if other acts alleged would be untimely on their own. *See Morgan*, 536 U.S. at 117.  Plaintiff's hostile work environment claims include the FBI's denial of his first transfer request.  *See* Compl. ¶¶ 164, 172.  Because this act occurred less than 45 days from June 5, 2019, the date Plaintiff first contacted an EEO counselor, Plaintiff may be able to recover for any acts that, along with his first transfer request denial, "collectively constitute one unlawful employment practice." *See Morgan*, 536 U.S. at 117, (internal quotation marks omitted).  Consequently, the court will not dismiss Plaintiff's hostile work environment claim as untimely.

**B.  Failure to State a Claim**

Defendant also argues that several of Plaintiff's claims should be dismissed for failure to

state a claim under Fed.R.Civ.P. 12(b)(6).  The court need only consider this argument as to

claims that will not be dismissed for failure to exhaust administrative remedies.  This leaves

Plaintiff's security clearance revocation and indefinite suspension claims, hostile work

environment claims, and first transfer denial claim.

1.  Plaintiff's Security Clearance Revocation and Indefinite Suspension Claims

Defendant argues that Plaintiff's security clearance and indefinite suspension claims

should be dismissed because *Dep't of Navy v. Egan*, 484 U.S. 518 (1988) precludes judicial

review of Title VII claims challenging employment actions based on security-related predictive

judgments.  Def.'s Motion at 15 (citing *Foote v. Moniz*, 751 F.3d 656, 659 (D.C. Cir. 2014);

*Rattigan v. Holder*, 643 F.3d 975, 985 (D.C. Cir. 2011) (*Rattigan I*), vacated in part on other

grounds, 689 F.3d 764 (D.C. Cir. 2012) (*Rattigan II*); *Bennett v. Chertoff*, 425 F.3d 999, 1002-

1003 (D.C. Cir. 2005); *Ryan v. Reno*, 168 F.3d 520, 523 (D.C. Cir. 1999)).  Plaintiff counters

that he does not challenge his security clearance revocation or his suspension but rather claims

that "Bureau employees acted with retaliatory and/or discriminatory motive in reporting or

referring information that they knew to be false" to the Security Division.  Pl.'s Opp'n at 6.

Plaintiff further contends that because the sole act to be evaluated by the court is the

discriminatory and/or retaliatory referral—which occurred before the security clearance

determination—"*Egan* does not preclude Plaintiff's Title VII claim (the false security referral

itself) as a matter of law."  *Id.*

The D.C. Circuit has held that "*Egan's* absolute bar on judicial review covers only

security clearance-related decisions made by trained Security Division personnel and does not

preclude all review of decisions by other FBI employees who merely report security concerns."

*Rattigan II*, 689 F.3d at 768.  The Circuit further found that a "Title VII claim may proceed only

if [the plaintiff] can show that agency employees acted with a retaliatory or discriminatory

motive in reporting or referring information that they knew to be false." *Id.* at 771.  A plaintiff

seeking to advance a *Rattigan*-based Title VII claim related to an agency's revocation of his

security clearance must show that: (1) the agency employee had a discriminatory or retaliatory

motive to report the plaintiff or to refer false information about him, and (2) the reporting

employee knew that the report or referral of information was false.  *See id.*  "Motive and

knowing falsity must unite in the same person." *Rattigan v. Holder*, 780 F.3d 413, 416 (D.C.

Cir. 2015) (*Rattigan III*).

Plaintiff's Complaint lacks factual allegations that would meet the *Rattigan* requirements.

He claims that OPR provided his October 2018 proposed suspension to the FBI's Security

Division, but, as a court found in a similar case, "it is not clear from the facts as alleged exactly

when the referral to the security clearance office occurred, much less who, in particular, made

the referral, which is information that is necessary for the court to determine whether or not the

motive and knowing falsity elements 'unite in the same person.'" *Horsey v. U.S. Dep't of State*,

170 F. Supp. 3d 256, 270 (D.D.C. 2016) (dismissing plaintiff's *Rattigan*-type Title VII claim

challenging an indefinite suspension).  In his opposition, Plaintiff attempted to cure this defect by

asserting new theories regarding the referral: namely that Drager falsely reported that Plaintiff

sexually harassed her and OPR Acting Assistant Director McNamara sent that information to the

Security Division.  *See* Pl.'s Opp'n at 8.  But a plaintiff may not amend a complaint by way of

responsive briefing.  *Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Serv.*, 297 F. Supp.

2d 165, 170 (D.D.C. 2003) (quoting *Coleman v. Pension Benefit Guar. Corp.*, 94 F.Supp.2d 18,

24 n.8 (D.D.C. 2000)).  And in any event, Plaintiff does not allege that McNamara had a

discriminatory or retaliatory motive and knowingly submitted a false report which caused

Plaintiff to lose his security clearance.  Accordingly, the court will dismiss Counts 1-4 with

respect to Plaintiff's security clearance revocation and indefinite suspension claims.

   2.   Plaintiff's Hostile Work Environment Claims

       A hostile work environment exists, for purposes of Title VII, "[w]hen the workplace is

permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive working

environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and

citation omitted).  Although *Morgan* permits consideration of time-barred acts as part of a hostile

work environment claim, it is not "an open sesame to recovery for time-barred violations."

*Baird v. Gotbaum*, 662 F.3d 1246, 1251 (D.C. Cir. 2011).  The court must determine: a) whether

the time-barred and timely filed acts are adequately connected to each other (i.e., "all acts which

constitute the claim are part of the same unlawful employment practice," *Morgan*, 536 U.S. at

122), and b) whether the acts collectively meet the independent requirements of that claim (i.e.,

are "sufficiently severe or pervasive ...," *Harris*, 510 U.S. at 21).

                              *a.  Adequately Connected*

       In *Morgan*, the Supreme Court affirmed the Ninth Circuit's holding that acts constitute

the same hostile environment claim if they involve, for example "'the same type of employment

actions, occurred relatively frequently, and were perpetrated by the same managers.'"  *Morgan*,

536 U.S. at 120 (quoting *Morgan v. Nat'l R.R. Passenger Corp.*, 232 F.3d 1008, 1017 (9th Cir.

2000)); *see also id.* at 118 (excluding any incident that "had no relation to the [other] acts ... or

for some other reason, such as certain intervening action by the employer, was no longer part of

the same hostile environment claim").  In other words, "acts before and after the limitations

period [that are] so similar in nature, frequency, and severity ... must be considered to be part and

parcel of the hostile work environment." *Baird*, 662 F.3d at 1251 (quoting *Wilkie v. Dep't of Health & Human Servs.*, 638 F.3d 944, 951 (8th Cir. 2011)).

In *Vickers v. Powell*, 493 F.3d 186 (D.C. Cir. 2007), plaintiff alleged that her prior supervisor engaged in coarse behavior and made sexual and sexist comments, and that her subsequent supervisor spoke harshly to her while supervising her. *Id.* at 199. Despite the fact that the conduct involved different supervisors, was both sexual and non-sexual, and occurred over a span of eight years before the timely reported events, the Circuit found that the prior supervisor's actions reasonably could have been part of same hostile work environment created by the subsequent supervisor's actions. *Id.* at 199-200 (finding that the prior supervisor's sexual conduct and the successor's perpetuation of the environment that condoned such behavior was not so well-defined that the supervisors' acts had "no relation" to the successor's act as required in *Morgan*). Relying on *Vickers*, in *Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 76 (D.D.C. 2013), the court found that plaintiff's untimely filed allegations regarding her supervisor and timely filed allegations regarding her coworker reasonably could have been part of the same unlawful employment practice because both acted in ways that were sexual or romantic in nature and they worked in the same division. The court made this finding despite the fact that the alleged acts concerned different individuals at different levels of the organization, took place in different settings (one at a social gathering during an out-of-town work trip and the other at work during business hours), and involved different frequency (the supervisor incident took place once whereas incidents involving the coworker occurred several times over an approximately five-month period). *Id.*

Plaintiff argues that the FBI's May 30, 2019 denial of his first transfer request is part of the same unlawful practice as the denial of his second transfer request and a string of alleged

incidents that occurred between October 2017 and May 2019, including Beno's suggestion that

Plaintiff resign, Beno's rating Plaintiff's performance as "Excellent" instead of "Outstanding,"

Beno's failure to report that Plaintiff felt threatened by Drager's husband, who also worked for

the FBI, executive management's failure to prevent FBI employees from discussing Plaintiff's

INSD investigation, Carroll's refusal to consider Plaintiff for the Latino Media Representative

position, and McNamara's 60-day suspension of Plaintiff.  Pl.'s Opp'n at 14-15.

Plaintiff does not allege that these acts involved "the same type of employment actions,

occurred relatively frequently, and were perpetrated by the same managers."  *Morgan*, 536 U.S.

at 120.  Nor does he allege that the employment actions took place in the same division, unlike

*Vickers* and *Bergbauer*.  For example, Beno's decision to rate Plaintiff "Excellent" and Carroll's

decision not to appoint Plaintiff as the Latino media representative took place in the Chicago

Field Office, while OPR's decision to suspend Plaintiff for 60 days and the Human Resource

Division's decisions to deny Plaintiff's transfer requests took place at FBI headquarters in

Washington, D.C.  Def.'s Reply at 8.  These incidents are mostly different employment actions

(suspension after investigation, failure to promote, denial of transfer, etc.) that occurred during

different time periods, and in different places.  In fact, the only repeat employment actions were

Plaintiff's transfer denials, and those occurred nearly one year apart.  *See* Compl. ¶¶ 109, 124.

Even viewing the facts in the light most favorable to Plaintiff, the court finds that his claims of

events occurring before April 2019 are not sufficiently related to the timely filed transfer request

claim, but the two transfer denials could be reasonably related.  Accordingly, the court will

dismiss Plaintiff's claims relating to events before April 2019 but will not dismiss his claims

arising out of the two transfer requests.

### b.  Sufficiently Severe or Pervasive

To determine whether an employer's actions were "sufficiently severe or pervasive to

alter the conditions of the victim's employment and create an abusive working environment,"

*Harris*, 510 U.S. at 21, a court should consider "all the circumstances, including the frequency of

the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a

mere offensive utterance; and whether it unreasonably interferes with an employee's work

performance."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (internal quotation

marks omitted); *see also Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (finding

disciplinary actions and sporadic workplace conflicts were not so severe or pervasive to have

changed conditions of plaintiff's employment because employer's actions did not focus on

employee's race, religion, age, or disability, and did not subject plaintiff to tangible workplace

consequences).  To constitute "a change in the terms and conditions of employment" the

complained of conduct must be "extreme."  *Faragher*, 524 U.S. at 788.

As discussed above, Plaintiff's hostile work environment claim now consists of his two

transfer request denials.  He argues that "[a]t this threshold stage, the possibility that these

actions were based on an impermissible consideration, such as Plaintiff's race, national origin,

gender, and/or protected EEO activity cannot be discounted."  Pl.'s Opp'n. at 16.  But he

provides no factual allegations to indicate that the FBI's denial of his transfer request had

anything to do with his race, national origin, gender, or prior EEO activity.  He does not claim

that the FBI's Human Resource Division made any derogatory comments to him in denying his

transfer request, or any other statements that would indicate that their decision was motivated by

racial or other animus.  Consequently, the two transfer denials, which took place one year apart,

appear to be "isolated incidents [that] are not fairly characterized as pervasive."  *Laughlin*, 923 F.

Supp. 2d at 220.  Plaintiff therefore fails to state a prima facie case of hostile work environment,

because he does not allege that his workplace was so "permeated with discriminatory

intimidation, ridicule, and insult that [it was] sufficiently severe or pervasive to alter the

conditions of [his] employment and create an abusive working environment."  *Harris*, 510 U.S.

at 21.  Therefore, the court will dismiss Plaintiff's hostile work environment claims (Counts 2

and 4).

    3.  Plaintiff's First Transfer Request Denial

Plaintiff's only remaining claims are Counts 1 and 3, alleging disparate treatment on the

bases of race, national origin, and sex and retaliation in the denial of Plaintiff's first transfer

request on May 30, 2019.  Compl. ¶ 109.

                    a.  *Disparate Treatment Based on Race, National Origin, and Sex*

The D.C. Circuit recently held in *Chambers v. District of Columbia*, 35 F.4th 870, 872

(D.C. Cir. 2022) (en banc) that "an employer that transfers an employee or denies an employee's

transfer request because of the employee's race, color, religion, sex, or national origin violates

Title VII by discriminating against the employee with respect to the terms, conditions, or

privileges of employment."  Under that framework, even discriminatory transfer denials that do

not cause a plaintiff "objectively tangible harm" still violate Title VII.  *See id.* at 874–75, 879.

But even post *Chambers*, courts in this district have dismissed Title VII discrimination claims for

"baldly stating that the alleged employment action adversely affected the terms, conditions, or

privileges of employment without proffering supporting facts or allegations."  *Black v. Guzman*,

No. CV 22-1873 (BAH), 2023 WL 3055427, at *8 (D.D.C. Apr. 24, 2023) (dismissing plaintiff's

claims that she was discriminatorily "pulled from" two work events because she failed to provide

details about any impact on her compensation, benefits, and promotion opportunities); *see, e.g.,*

*Garza v. Blinken*, No. 21-CV-02770 (APM), 2023 WL 2239352, at *5 (D.D.C. Feb. 27, 2023)

(finding that a "proposed letter of reprimand" issued to plaintiff failed to state a claim for an adverse employment action because the "complaint [was] devoid of any facts suggesting that the proposed letter affected the terms and conditions of [the plaintiff's] employment," and instead merely "assert[ed] in a conclusory manner that the letter of proposed reprimand had a material effect on the terms and conditions of her employment") (quotation marks omitted); *Brown v. Mayorkas*, No. CV 20-3107 (TJK), 2023 WL 3303862, at \*7 (D.D.C. May 8, 2023) (dismissing discrimination claims regarding transfer because plaintiff "never specifically allege[d] that her race or sex motivated the [] transfer").

Here, Plaintiff states in conclusory language that Defendant denied his transfer request because of his race but does not specifically allege any facts showing how race motivated the denial.  For example, Plaintiff does not claim that his coworkers made demeaning comments about his race or that Defendant approved transfer requests for his White, similarly situated coworkers.  *See Davis v. D.C.*, 949 F. Supp. 2d 1, 8 (D.D.C. 2013) (finding disparate treatment occurs when "[t]he employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin.")  As in *Black* and *Garza*, Plaintiff does not allege facts suggesting that his transfer request denial affected the terms and conditions of his employment, such as compensation, benefits, and promotion opportunities.  Because "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Iqbal*, 556 U.S. at 678, the court will dismiss Count 1 regarding Plaintiff's claim of disparate treatment based on race, national origin, and sex.

### b.  Disparate Treatment Based on Retaliation

Title VII makes it an "unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful

employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).  To survive a motion to dismiss, a plaintiff must plausibly establish that (1) he engaged in a statutorily protected activity, (2) he suffered a materially adverse action, and (3) there is a causal connection between the two.  *See Taylor v. Small*, 350 F.3d 1286, 1292 (D.C. Cir. 2003); *Holcomb v. Powell*, 433 F.3d 889, 902–03 (D.C. Cir. 2006).  An adverse action is one that "could well dissuade a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).  A plaintiff may establish a causal connection "by showing that the employer had knowledge of the employee's protected activity, and that the [retaliatory] personnel action took place shortly after that activity."  *Cones v. Shalala*, 199 F.3d 512, 521 (D.C. Cir. 2000) (quotation omitted); *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (citing approvingly cases finding temporal proximity of three and four months insufficient to show a causal connection); *Jones v. D.C. Water & Sewer Auth.*, 922 F. Supp. 2d 37, 42 (D.D.C. 2013) ("[T]his Circuit has generally found that a two- or three-month gap between the protected activity and the adverse employment action does not establish the temporal proximity needed to prove causation.").  In *Brown*, 2023 WL 3303862, at *9, the court dismissed plaintiff's retaliation claim based on her transfer because it found that plaintiff contacted the EEO and notified her supervisor of her protected activity after defendant decided to transfer her and so the protected activity could not have caused the transfer.

As in *Brown*, Plaintiff does not allege a causal connection between his protected activity and the alleged material adverse action.  Defendant denied Plaintiff's transfer request on May 30, 2019, Compl. ¶ 109, and Plaintiff contacted his EEO counselor on June 5, 2019, meaning his

protected activity postdated the denial.  *Id.* ¶ 155.  And Plaintiff's earlier protected activity

occurred years before the denial.  For example, Plaintiff reported his coworkers for hanging a

Nazi flag in 2016, *id.* ¶¶ 17, 24, 26, and reported his supervisor and coworkers for discussing the

details of his INSD investigation in 2018.  *Id.* ¶¶ 55-56.  Thus, the court finds that Plaintiff failed

to state a claim for disparate treatment based on retaliation and will accordingly dismiss Count 3.

## IV.    CONCLUSION

For the reasons set forth above, the court will GRANT Defendant's Motion to Dismiss,

ECF No. 8.


Date: September 21, 2023


*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge